Filed 6/9/21  P. v. Vargas CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

THE PEOPLE,

     Plaintiff and Respondent,

v.

RAMON ANTONIO BEJARNO VARGAS,

     Defendant and Appellant.

E073452

(Super. Ct. No. FWV1500259)

OPINION

APPEAL from the Superior Court of San Bernardino County.  Bridgid M. McCann, Judge.  Affirmed with directions.

Allen G. Weinberg under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Annie Featherman Fraser, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury convicted Ramon Vargas of multiple counts of sexually abusing his younger half-sister, Jane Doe, for ten years (counts 3 through 10). On appeal, defendant argues that (1) Evidence Code section 1108, permitting admission of evidence of uncharged sex offenses and consideration of other charged sex offenses, is unconstitutional and, as applied, violates his right to due process; (2) CALCRIM Nos. 1191A and 1191B, instructing jurors on evidence of uncharged and other charged sex offenses, violate his right to due process; (3) the trial court violated his right to effective assistance of counsel by excluding a PowerPoint slide from his attorney's closing argument presentation; (4) the trial court violated his state and federal due process rights by imposing fines, fees, and assessments without determining he had the ability to pay them and without holding an ability-to-pay hearing; (5) remand for sentencing on count 13 is required; and (6) the abstract of judgment should be corrected to describe count 3 as "Aggravated Sexual Assault: Minor: Sexual Penetration."

We agree with the last two points but otherwise affirm the judgment.

BACKGROUND

Doe's mother, Martha P. (Mother), has six children. Doe (born in 1996) is the youngest, and defendant, Doe's half-brother, is the oldest. Defendant is 10 and one-half years older than Doe. Doe first met defendant in 2005, when she was eight years old and in the second grade. At that time, she lived in an apartment in Vista with her mother and sister and two of her other brothers. Defendant lived with them in Vista for one month and then went to live with Mother's sister, Aunt C.

2

When Doe was nine years old and in the third grade, she moved with her family and defendant to an apartment in San Marcos. They lived there for less than one year. Doe shared a bedroom with her sister, D.P., who is three years older than Doe. Defendant had his own room. Defendant started sexually abusing Doe in 2005. Defendant digitally penetrated Doe's vagina at night while in his bedroom. Doe resisted, but defendant told her to be quiet and continued. Doe started sleeping with defendant in his room. Defendant disciplined Doe and her other siblings. Doe did not tell anyone defendant was sexually abusing her, because defendant told her no one would believe her and she felt threatened.

When Doe was 10 years old, she moved with her family to another apartment in Vista. She shared a bedroom with defendant and slept in a twin bed with him. In 2007, Mother's sister, Aunt D., moved in with Doe's family. Aunt D.'s husband testified he saw Doe go into defendant's bedroom and sleep there. Doe testified defendant continued to digitally penetrate her and escalated his sexual abuse to sexual intercourse.

On one occasion, when Doe was with her siblings at a pool down the street, defendant told Doe to get out of the pool and go with him. When they back got back to their apartment, defendant had intercourse with Doe in their bedroom for the first time. Thereafter, defendant had intercourse with Doe almost every night while they lived at the Vista apartment. He also digitally penetrated her. Mother was not home when it happened. She was a hospice nurse, which required her to stay overnight at work.

One of Aunt D.'s children, S.S., testified that in 2007, when she was 18 years old, she noticed defendant and Doe were in a bedroom together for hours, sometimes overnight, with the door locked. One time, when defendant summoned Doe into the bedroom, S.S. called defendant a "pervert." Defendant became furious. S.S. felt intimidated. Defendant and Doe then went into the bedroom and closed the door.

When Doe was 10 or 11 years old and in the fourth grade, Doe and her family moved to another apartment in Vista on the same street as her previous apartment. Again, defendant and Doe shared a room and a twin bed, where defendant continued daily to have sexual intercourse with Doe and digitally penetrate her. In addition, defendant began orally copulating her. He also started getting angry with Doe, questioning her about who she was playing with, pushing her around, and punching her in the head. Defendant would get angry at her if she played with boys her age. He told her he was watching her and threatened to hurt her. One time he punched her in the head with his fist after seeing her playing outside with a friend. Doe testified she lived in constant fear of defendant.

After living in the Vista apartment for about one year, Doe and her family moved to San Marcos. Defendant, Doe, and D.P. shared a room. Defendant and Doe shared a bed, and D.P. slept in the other bed. Defendant continued daily to have intercourse with Doe, orally copulate her, and digitally penetrate her. He also forced Doe to orally copulate him. The first time, Doe said she did not want to. Defendant grabbed her head and used force. Doe testified she did not want to participate but felt she could not stop

4

defendant because "he had control over my whole life." He did not allow her to play outside, go swimming, or spend the night at her cousin's house. If she did, he would hit or beat her.

While Doe was living in San Marcos, defendant moved to Oceanside to work at a restaurant and live with Aunt J., Mother's sister. Defendant went to Doe's house three to four times per week and had intercourse with her, digitally penetrated her, and orally copulated her. On Christmas Eve in 2009, when Doe was 13 years old, Doe's family had a large family gathering at her home. Aunt J., her family, and defendant were there. Aunt J. asked defendant to go to her house and get formula for her twin infants. Doe went with defendant. Defendant took Doe into his bedroom and sodomized Doe.

Before Doe started eighth grade, Doe and her family moved back to Vista. Aunt J.'s family and defendant also moved to Vista, to an apartment across from Doe's. Defendant told Doe to sleep in his bedroom at Aunt J.'s home so she could help with Aunt J.'s twins. Defendant continued to sexually abuse Doe.

When Doe was 14 years old and was starting high school, defendant gave her a cell phone. Defendant had an application on his phone that mirrored Doe's phone calls. He told her to use the phone to call him and send him nude pictures of herself. Defendant wanted to know where Doe was at all times and what she was wearing. He dictated what she could wear. Doe complied because she did not want defendant to beat her.

When Doe was 14 years old and in the ninth grade, she and her family moved to Ontario. Aunt J.'s family and defendant moved to another apartment in Vista. Defendant

5

visited Doe once per week and spent the night with Doe. Defendant continued to sexually abuse Doe during his visits. He also physically abused her by hitting, slapping, and punching her if she socialized with her siblings or other teenagers. Doe's family moved two more times to condominiums in Ontario, staying a short time at each location. Defendant continued to visit Doe once each week and sexually abuse her. Aunt J. and her family moved in with Doe's family and then moved back to Oceanside.

Around Christmastime, when Doe was 15 years old, defendant took her to the Capri Inn in Ontario and sexually abused her, including having sexual intercourse, orally copulating her, having her orally copulate him, and trying to put his entire hand in her vagina. When Doe was 16 or 17 years old, defendant took her to Knights Inn in Ontario and sexually abused her.

In 2013 or 2014, defendant worked at a restaurant in Fallbrook and rented a house in back from the restaurant owners. The summer before her junior year in high school, when Doe was 16 years old, she lived with defendant and worked four or five days a week at the restaurant with him. Defendant married another woman, B.H., in 2014, but Doe testified that B.H. did not live with defendant then. B.H. lived in Vista with her family. Defendant continued to sexually abuse Doe daily. He also slapped, punched, choked, and kicked her, and he hit her with a charger cord. Doe said he treated her like a slave. She described her relationship with him as "controlling." One time she went out with D.P., and when defendant found out, he beat both of them with a belt. The last time defendant sexually abused Doe was on Christmas Eve in 2014.

Doe testified that in January 2015, defendant texted her and threatened to kill her, so she finally told Mother about defendant's abuse but did not provide details. Mother grabbed Doe's phone, called defendant, and confronted him. Doe was terrified that defendant would kill her. Two days later, on January 16, 2015, the police were called because defendant entered Doe's home in Ontario without permission. Defendant left before the police arrived. Later, that day defendant was taken into custody. Doe spoke to the police when they arrived at her home and at the police station. In a four-hour interview, she described how defendant had sexually and physically abused her for the previous 10 years.

Police located defendant's laptop computer and cell phone. The police found nude photographs of Doe on his cell phone, taken when she was 15 or 16 years old. One of defendant's cell phones also showed that in 2013, defendant accessed websites, "teenporntube.com" and "Yahoo Answers." His phone showed he had asked on Yahoo Answers, "I'm in love with my sister. What do I do?," "Why do I desire sexually my older sister," and "I desire sexually my half-sister."

D.P. testified that in 2008 or 2009, when she was 15 years old, defendant groped her. Around midnight, she awoke when she felt defendant touch and rub her vagina. She opened her eyes and found defendant lying next to her. D.P. hit him with a pillow and told him to get out of her bed. Defendant went to his bed, and D.P. left her room for the rest of the night.

7

Mother testified that defendant slept at her home only once, after he first moved to the United States in 2004. She was living in San Marcos, and defendant slept with Mother in her bed. He then went to live with Aunt J. in Oceanside. Mother said that when she lived in Ontario, defendant lived with his wife. He never lived with Doe and never slept in the same bed with Doe. Mother testified that when defendant visited her in Ontario, he came with his wife or other family members. In January 2015, Mother got angry at Doe because she left with one of Mother's patients in Mother's car without telling Mother. When Doe returned, she and Mother got into an argument, and Doe was angry at Mother because Mother had called defendant. Doe then told Mother that defendant had been sexually abusing her.

Aunt C. testified that defendant had lived with Mother for four or five days when he first came to the United States and lived with Aunt C. for almost one year in Oceanside. Aunt J. testified she was nine years older than defendant and very close to him. They were raised together like siblings in Honduras. Aunt J. lived with Mother in Vista in 2008. At that time, defendant was living with a friend, not with Mother. Defendant lived with Aunt J. both in Oceanside and then in Vista at the same apartment complex as Mother. Aunt J. testified Doe did not visit them or spend the night. She also denied defendant and Doe had ever gone to her home to get baby formula. When Aunt J. and Mother moved to Ontario, defendant moved in with his wife, B.H.

B.H. testified defendant moved in with her and her family in Vista in the fall of 2013 and worked at a restaurant from April 2013 to December 2013. B.H. and defendant

8

married in 2014.  They visited Mother in Ontario on holidays and weekends.  Defendant never went without B.H., and he slept with her and their son when they spent the night.

Police Detective Naranjo testified that when he interviewed Mother on January 16, 2015, she was friendly, sincere, and talkative.  She told him that on January 14, 2015, Doe told her for the first time that defendant had abused her and had done so for a long time.  Doe told Mother she was terrified of him.  Mother initially told Detective Naranjo that defendant did not live with her and then admitted he had but said it was a long time ago.  Naranjo testified Mother told him that defendant had threatened Doe, saying something like, "You're going to see mean, girl.  You bitch.  I'm going to beat you if you're roaming the streets at night."

Defendant's first trial ended in a hung jury and mistrial as to counts 3 through 10, with the jury acquitting him of charges for sexual offenses and assault in counts 1, 2, 11, and 12.  The jury found defendant guilty on count 13 of the lesser-included misdemeanor of simple assault (§ 240; count 13).

In defendant's second trial, the jury convicted defendant of aggravated sexual assault of a child by sexual penetration (Pen. Code, § 269, subd. (a)(5)[1]; count 3; undesignated statutory citations are to this code), aggravated sexual assault of a child by rape (§ 269, subd. (a)(1); counts 4 and 6), oral copulation with a child 10 years old or younger (§ 288.7, subd. (b); count 5), aggravated sexual assault of a child by oral copulation (§ 269, subd. (a)(4); count 7), aggravated sexual assault of a child by sodomy

---

[1]  Unless otherwise noted, all further statutory references are to the Penal Code.

(§ 269, subd. (a)(3); count 8), and lewd acts on a child (§ 288, subd. (c)(1); counts 9 and 10).  The court sentenced defendant to an aggregate indeterminate term of 75 years to life in prison.

DISCUSSION

I. *Evidence of an Uncharged Sexual Offense*

Over defendant's objection, the court admitted evidence of defendant's uncharged sexual abuse of Doe's half-sister, D.P.  In sex offense prosecutions, Evidence Code section 1108 permits the admission of uncharged sex offenses so long as that evidence is admissible under Evidence Code section 352.  (Evid. Code, § 1108, subd. (a).)  CALCRIM No. 1191A is the pattern jury instruction regarding uncharged sex offenses.  Defendant contends that Evidence Code section 1108 and CALCRIM No. 1191A violate his right to due process.

Although defendant did not raise his due process objections in the trial court, we reject his arguments on the merits.  As defendant acknowledges, the California Supreme Court has repeatedly rejected due process challenges to Evidence Code section 1108.  (*People v. Molano* (2019) 7 Cal.5th 620, 664; *People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 827; *People v. Loy* (2011) 52 Cal.4th 46, 60-61 (*Loy*); *People v. Lewis* (2009) 46 Cal.4th 1255, 1288-1289; *People v. Falsetta* (1999) 21 Cal.4th 903, 922.)  Our high court has also rejected a challenge like defendant's to CALJIC No. 2.50.01, an instruction that is materially similar to CALCRIM No. 1191A.  (*People v. Reliford* (2003) 29 Cal.4th 1007, 1013-1016 [instruction properly informed jurors they

10

may infer guilt from evidence of uncharged offenses, did not mislead jurors about prosecution's burden of proof, and contained "no constitutional error"].)  We are bound by those decisions.  (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

Defendant next argues that the trial court erred by admitting evidence of his uncharged sexual offense against D.P. because its prejudicial effect outweighed any probative value under Evidence Code section 352.  We disagree.

We review the court's admission of the evidence for abuse of discretion.  (*Loy*, *supra*, 52 Cal.4th at p. 61.)  Evidence Code section 352 "gives the trial court discretion to exclude evidence if its probative value is substantially outweighed by the probability that its admission will necessitate undue time consumption or create substantial danger of undue prejudice, confusing the issues, or misleading the jury.  In exercising this discretion as to a sexual offense, 'trial judges must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission . . . .'"  (*Loy*, *supra*, at p. 61.)  Evidence is "unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it

11

is relevant, but to reward or punish one side because of the jurors' emotional reaction." (*People v. Doolin* (2009) 45 Cal.4th 390, 439.)

Defendant fails to show an abuse of discretion here. He does little more than assert in a conclusory manner that the evidence was more prejudicial than probative, and he does not examine the pertinent factors. A number of those factors weigh in favor of admission. The uncharged sexual offense was not remote in time. It occurred in 2008 or 2009, when defendant was sexually abusing Doe. Defendant sexually abused Doe from 2005 until 2015, beginning when Doe was nine years old. The uncharged offense was similar to the charged sexual offenses that defendant committed against Doe. Defendant fondled D.P.'s vaginal area under her clothing while in bed when she was 15 or 16 years old. Defendant committed similar acts against Doe when she was the same age, also in defendant's bedroom.

The burden of defending against the uncharged offense was no greater than the burden of defending against the charged offenses, given that it involved some of the same witnesses, was strikingly similar to some of the charged offenses, and occurred during the same period of time and at the same location where defendant had sexually abused Doe. In addition, both Doe and D.P. were defendant's half-sisters, and defendant sexually abused D.P. when she was sharing a bedroom with Doe and defendant. The evidence of the uncharged sexual offense was no more inflammatory than the evidence of the numerous charged offenses. It was therefore unlikely to have had an unduly prejudicial

12

impact. The court thus acted well within its discretion by admitting the evidence of the uncharged offense.

For all of these reasons, we reject defendant's arguments relating to the uncharged sexual offense against D.P.

II. *CALCRIM No. 1191B*

Defendant contends that CALCRIM No. 1191B violates his right to due process. CALCRIM No. 1191 was modified in 2017 to distinguish uncharged offenses from charged offenses offered as propensity evidence. CALCRIM No. 1191A now applies to uncharged offenses offered as propensity evidence, and CALCRIM No. 1191B applies to charged offenses offered for that purpose. (See *People v. Gonzales* (2017) 16 Cal.App.5th 494, 496, fn. 1.)

Although defendant did not object to CALCRIM No. 1191B in the trial court, his argument is not forfeited because "failure to object to instructional error will not result in forfeiture if the substantial rights of the defendant are affected." (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.) We reject his argument on the merits.

As defendant acknowledges, in *People v. Villatoro* (2012) 54 Cal.4th 1152, the California Supreme Court held that Evidence Code section 1108 permits the jury to draw a propensity inference from currently charged sex offenses, and the court approved a modified version of CALCRIM No. 1191 that is similar to CALCRIM No. 1191B. Adhering to *Villatoro*, the trial court properly instructed the jury with CALCRIM No. 1191B. (*Villatoro*, *supra*, 54 Cal.4th at pp. 1259, 1164; *People v. Meneses* (2019) 41

13

Cal.App.5th 63, 66.)  We are bound by *Villatoro* (*Auto Equity Sales*, *Inc. v. Superior Court*, *supra*, 57 Cal.2d 450, 455), so we must reject defendant's claim of instructional error.  (*People v. Meneses*, *supra*, at p. 68.)[2]

III. *PowerPoint Slide Concerning Reasonable Doubt*

Defendant contends the trial court's exclusion of his attorney's PowerPoint slide concerning reasonable doubt violated defendant's federal and state constitutional rights to effective assistance of counsel.  The slide shows a bar graph reflecting 14 different levels of certainty about defendant's guilt:  "Guilt Beyond a Reasonable Doubt," "Strong Belief in Guilt," "Guilt Likely," "Probably Guilty," "Possibly Guilty," "Suspected," "Perhaps," "May Not Be," "Possibly Not," "Unlikely," "Probably Not," "Less Than Likely," "Highly Unlikely," and "Believed Not Guilty."  Everything other than guilt beyond a reasonable doubt was identified with a verdict of not guilty.  Defendant argues the slide was "a perfectly legitimate and useful tool" that explained that "beyond a reasonable doubt" was the highest standard of proof and all other conclusions regarding defendant's guilt listed on the slide were insufficient to meet it.

Out of the jury's presence, the trial judge heard argument on the propriety of the PowerPoint slide.  The prosecutor objected to the slide, which the trial court described as showing "a scale of the burden of proof."  The trial court excluded the slide, explaining:

---

[2] In view of our conclusion that there was no error in giving CALCRIM Nos. 1191A and 1191B, we reject defendant's contention that cumulative error deprived him of a fair trial and requires reversal of his conviction.  (*People v. Phillips* (2000) 22 Cal.4th 226, 244.)

14

"Because it does tend to quantify by size, the court is not going to allow this slide to be given. I don't have a problem if you have fewer of them, and there are gaps in between. Because we can't tell someone where guilt beyond a reasonable doubt is. And having blocks of each makes it seem as if there is a range. And some of these actually do overlap." The court told counsel he could use the slide if it were modified to address the court's concerns, but counsel said that he would just delete it because he could not change it "on the fly."

Regardless of whether the trial court abused its discretion by excluding the slide, any error was harmless. (*People v. Williamson* (1977) 71 Cal.App.3d 206, 217.) Defendant has not demonstrated prejudicial error under either *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*) or *People v. Watson* (1956) 46 Cal.2d 818. The court properly instructed the jury on reasonable doubt by giving CALCRIM No. 220. We presume the jury followed the instruction. (*People v. Edwards* (2013) 57 Cal.4th 658, 723.)

Moreover, defense counsel was permitted to argue that the prosecution did not carry its burden of proof. Counsel also was not prevented from describing the information included in the slide or revising the slide so that it did not improperly quantify the burden of proof. Defense counsel deleted the slide because he apparently was unable to revise it, but he orally conveyed the slide's content in his closing argument. Counsel stated: "Mr. Vargas is entitled to the highest burden of proof known in law. That's proof beyond a reasonable doubt. So proof isn't just even. It isn't just [the

prosecutor's] story is slightly more believable than mine so we brand him a criminal. It's much much much much much more than that." Defense counsel further explained that the reasonable doubt standard of proof is "proof that leaves you with an abiding conviction that the charge is true." "[Y]ou have to be quite sure, quite sure that you're not going to open up the paper and find a miscarriage of justice has been done, that this story has been recanted, that it didn't happen, somebody can prove it didn't happen. [¶] You have to be very confident of that. It's the highest burden of proof in the law. And it's the proof to the exclusion of any reasonable doubt. This means that no reasonable juror can have a single reasonable doubt of any of the elements of any of the offenses." Defense counsel added that "this burden of proof beyond a reasonable doubt, that's far higher than guilt likely. If you think of a spectrum down to he didn't do it to maybe he did it to perhaps he did it to likely he did it, you got to get all the way to the other end of the spectrum and prove beyond a reasonable doubt." Defense counsel noted he "did not have to prove it's impossible. Just have to have doubt that it occurred."

Defendant argues that the error was prejudicial because "the prosecution's evidence was not so strong that it would have obviated the reasonable doubt appellant's counsel might have created had he been able to take advantage of the slide he had prepared." He argues that the weakness of the prosecution's case is demonstrated by the result of his first trial, at which the jury acquitted him on several charges, convicted him on only one, and deadlocked on the remainder. We disagree. The fact that the first trial ended in a mistrial as to the retried charges does not support a finding of prejudicial error

16

because defendant has not shown the evidence, argument, and jury instructions in both trials were the same. Furthermore, powerful evidence of guilt was presented in the second trial, including not only the testimony of Doe, D.P., and other witnesses but also corroborating evidence collected from defendant's phone and laptop, such as nude photographs of Doe and internet searches concerning defendant's sexual attraction to his sister. In addition, the exclusion of the PowerPoint slide did not significantly limit defense counsel's ability to address the reasonable doubt standard in closing argument— counsel argued the point along the same lines and in largely the same terms depicted in the excluded slide.

For all of the foregoing reasons, we are persuaded beyond a reasonable doubt that defendant would not have obtained a more favorable result if the slide had not been excluded. (*Chapman*, *supra*, 386 U.S. at p. 24.) For even stronger reasons, it is not reasonably probable that the jury would have come to a conclusion more favorable to defendant had the jury seen the slide. (*People v. Watson*, *supra*, 46 Cal.2d at pp. 835-836.)

IV. *Ability to Pay Fines and Fees*

Relying on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), defendant argues that we must strike the court operations and facilities fees and stay the restitution fine because the fines and fees were imposed without an ability-to-pay hearing or a finding of ability to pay. We disagree. If there was any *Dueñas* error, the error was harmless.

At the outset of defendant's sentencing hearing, the court stated that it was assuming based on the probation report that defendant had "no other financial ability to make any fines or fees" and assumed defendant was requesting "the statutory minimum." Defense counsel responded that was correct. The court then found that defendant did not have the ability to reimburse appointed counsel or pay the $727 cost for the presentence investigation and report preparation. The court ordered defendant to pay $560 for court construction and operations fees. The court also imposed a $700 restitution fine and imposed but stayed a $700 parole revocation restitution fine, which exceeded the $300 statutory minimum but were less than the $10,000 fines recommended in the probation report.

*Dueñas* held that defendants have a due process right under the federal and state Constitutions to a hearing on their ability to pay court operations and facilities fees. (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1164.) In addition, "to avoid serious constitutional questions" raised by the statutory restitution scheme, the court must stay execution of the mandatory restitution fine unless the court determines that the defendant has the ability to pay it. (*Id*. at p. 1172.) The same court that decided *Dueñas* has since clarified that, at the ability-to-pay hearing, defendants bear the burden of showing their inability to pay, and the court "must consider all relevant factors," including "potential prison pay during

the period of incarceration to be served by the defendant[s]." (*People v. Castellano* (2019) 33 Cal.App.5th 485, 490-491.)[3]

The People argue that defendant forfeited his *Dueñas* challenges to the fines and fees by not objecting in the trial court. Defendant contends that if the issue was forfeited, his attorney's failure to object was ineffective assistance of counsel (IAC). We need not decide the issues of forfeiture, IAC, or *Dueñas* error because, even assuming there was *Dueñas* error, the error was harmless beyond a reasonable doubt. (*People v. Jones* (2019) 36 Cal.App.5th 1028, 1035; *Chapman*, *supra*, 386 U.S. at p. 24; *People v. Kipp* (1998) 18 Cal.4th 349, 377 [failure to assert a meritless position where there is no prejudicial error does not demonstrate IAC].)

Defendant was sentenced to a term of 75 years to life. He was 33 years old at the time of his sentencing. According to the probation report, he was in good health and had a 6th grade education. At the time of defendant's arrest, he had been earning $11.50 per hour as a restaurant cook. He had worked at the restaurant for three years. Although he had no assets, he also had no debts.

We may consider defendant's potential prison wages in evaluating the prejudicial effect of alleged *Dueñas* error. (*People v. Jones*, *supra*, 36 Cal.App.5th at p. 1035; *People v. Taylor* (2019) 43 Cal.App.5th 390, 402.) "[E]very able-bodied" prisoner is required to work. (§ 2700; Cal. Code Regs., tit. 15, § 3040, subd. (a).) A prisoner's

---

[3] The California Supreme Court has granted review of the issues presented by *Dueñas* in *People v. Kopp* (2019) 38 Cal.App.5th 47, review granted November 13, 2019, S257844.

assignment to a paid position "is a privilege" that depends on "available funding, job performance, seniority and conduct." (Cal. Code Regs., tit. 15, § 3040, subd. (k); accord *People v. Rodriguez* (2019) 34 Cal.App.5th 641, 649; *Taylor*, *supra*, 43 Cal.App.5th at p. 402.) Wages in prison range from $12 to $56 per month, depending on the job and skill level involved. (Cal. Code Regs., tit. 15, § 3041.2, subd. (a)(1).) Fifty percent of defendant's wages and trust account deposits will be deducted to pay any outstanding restitution fine, plus another 5 percent for the administrative costs of this deduction. (§ 2085.5, subds. (a), (e); Cal. Code Regs., tit. 15, § 3097, subd. (f); *Taylor*, *supra*, at p. 402.)

Earning the $12 monthly minimum prison wage, defendant will be able to pay off his $1,260 of fines and fees in less than 10 years. Given defendant's age, the length of his sentence, and his employment history, we are persuaded beyond a reasonable doubt that he has the ability to pay the fines and fees imposed. We therefore conclude any *Dueñas* error or deficient performance by counsel was harmless.

V. *Sentencing on Count 13*

Defendant's first trial ended in a hung jury and mistrial as to counts 3 through 10, acquittal and mistrial as to counts 1, 2, 11, and 12, and a guilty verdict on count 13 for misdemeanor simple assault (§ 240; count 13). Defendant waived time for sentencing on count 13. Sentencing on count 13 was continued repeatedly and did not take place before the second trial. The probation report submitted after the second trial did not mention sentencing on count 13, and it was not mentioned during the sentencing hearing

20

following the second trial.  Defendant therefore asks us to remand the matter to the trial court for sentencing on count 13.  We agree and grant the request.

VI. *Correcting the Abstract of Judgment*

Defendant argues that the abstract of judgment filed on August 15, 2019, contains a clerical error that should be corrected.  The abstract of judgment states that defendant was convicted in count 3 of "Aggravated Sexual Assault:  Minor:  *Foreign Object*" (italics added).[4]  The second amended information states that defendant was charged in count 3 with aggravated sexual assault of a minor by "[*s]exual penetration*," in violation of sections 269, subdivision (a)(5), and 289, subdivision (a) (italics added).

Section 269, subdivision (a)(5), states that any person who commits "upon a child "[s]exual penetration" in violation of section 289, subdivision (a), is guilty of aggravated sexual assault of a child.  A person is guilty of forcible sexual penetration in violation of section 289, subdivision (a), when the act is accomplished against a child by means of force or fear of immediate and unlawful bodily injury.  Subdivision (k)(1) of section 289 defines "sexual penetration" as penetration of an anal or genital opening for the purpose of sexual gratification "by any foreign object, substance, instrument, or device, or by any unknown object."

---

[4]  To prevent the second jury from learning that the jury in the first trial acquitted defendant of counts 1 and 2, the trial court in the second trial referred to counts 3 through 10 as counts 1 through 8 in the verdict forms and jury instructions.  The jury instructions and verdict forms from the second trial consequently refer to count 3 as count 1, but the abstract of judgment and second amended information refer to the offense as count 3.

21

Defendant argues that although penetration by using a foreign object is an element of the count 3 offense of aggravated sexual assault, the offense should be referred to as sexual penetration. The People are not opposed to amending the abstract of judgment as defendant requests. We agree the requested amendment is appropriate. Accordingly, the abstract of judgment and sentencing minute order of August 13, 2019, should be corrected to refer to count 3 as "Aggravated Sexual Assault: Minor: Sexual Penetration."

DISPOSITION

The trial court is directed to sentence defendant on count 13 and to modify the abstract of judgment and sentencing minute order to refer to count 3 as "Aggravated Sexual Assault: Minor: Sexual Penetration." The court is also directed to send a copy of the new abstract of judgment to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ
J.

We concur:

RAMIREZ
P. J.

McKINSTER
J.

22